Stefan Savic, Esq.
Andrea Fiocchi, Esq.
Brian L. Grossman, Esq.
**REINHARDT SAVIC FOLEY LLP**
Wall Street Plaza
88 Pine Street, 5th Floor
New York, New York 10005
Telephone:   (212) 710-0970
Facsimile:    (212) 710-0971
ssavic@rsf-llp.com
afiocchi@rsf-llp.com
bgrossman@rsf-llp.com
*Attorneys for Cipriani USA, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CIPRIANI USA, INC. D/B/A CIPRIANI**<br><br>Plaintiff,<br><br>v.<br><br>**SOCIETA' EDITORIALE IL FATTO S.P.A. D/B/A IL FATTO QUOTIDIANO; RAI - RADIOTELEVISIONE ITALIANA S.P.A. D/B/A REPORT**<br><br>Defendants. | Case No.:<br><br>**PLAINTIFF DEMANDS A TRIAL BY JURY** |

**COMPLAINT**

Plaintiff Cipriani USA, Inc. ("Plaintiff" or "Cipriani USA"), by and through its attorneys, Reinhardt Savic Foley LLP, alleges upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.     Scandals sell. Truth is optional. That appears to have been the guiding principle behind Defendants' reporting. Faced with a story built on innuendo, sensationalism, and one of the most

infamous names in modern history, Defendants chose clicks, ratings, and publicity over truth, accuracy and responsible journalism.

2.   After being confronted with the truth and provided with evidence demonstrating the falsity of their reporting, Defendants refused to correct the record and instead continued to advance the same injurious narrative. This action seeks to hold them accountable for their intentionally reckless conduct and the resulting substantial harm they caused to Cipriani's business and goodwill.

3.   This is a civil action arising from a deliberate, coordinated, and/or recklessly indifferent smear campaign directed at Giuseppe Cipriani, the Cipriani Group, and, critically, Plaintiff Cipriani USA, a New York-based business enterprise of which Giuseppe Cipriani is the controlling shareholder, brand ambassador and, in many instances, personal guarantor vis-à-vis third parties on behalf of the Cipriani Group.

4.   Defendants Società Editoriale Il Fatto S.p.A., doing business as *Il Fatto Quotidiano* ("Il Fatto"), and Rai – Radiotelevisione Italiana S.p.A. ("RAI"), together with its channel Rai 3 and program Report (collectively, "Report"), published, republished, broadcast, streamed, posted, and otherwise disseminated virally to the world a series of false, sensationalized, and highly damaging false accusations intended to paint Giuseppe Cipriani and those associated with him as corrupt, criminal, sexually depraved, politically compromised, and connected to Jeffrey Epstein (hereinafter "Epstein" or "Jeffrey Epstein") in ways that were false and unsupported.

5.   The accusations were not obscure. They were made through a major Italian newspaper and a nationally broadcast television program, then amplified virally and uncontrollably through websites, clips, reposts, social media channels, and third-party republication across multiple jurisdictions in various languages, including Italy, the United States, and Uruguay, where Plaintiff and its affiliated businesses have substantial commercial interests.

6. Although the falsehoods were framed around Giuseppe Cipriani personally, Defendants knew, or were reckless in disregarding, that the campaign would necessarily and foreseeably inflict severe and immediate commercial harm on Cipriani USA and the broader Cipriani business enterprise, including in New York.

7. That is exactly what occurred. As a direct and proximate result of Defendants' conduct, one of Plaintiff's lenders delayed the closing of a substantial loan transaction, imposed new terms and conditions, and required that Plaintiff retain an independent outside investigative firm, at extraordinary cost, to investigate and refute accusations that never should have been published in the first place.

8. Defendants were placed on express written notice that their reporting was false. They were warned in advance and again after publication and broadcast. Yet Defendants persisted.

9. Even after receipt of cease-and-desist notices setting forth in detail why the core allegations were false, misleading, and unsupported, Defendants continued to repeat and amplify those accusations, or refused to retract them in any meaningful way, while the damage metastasized virally and globally.

10. Plaintiff does not assert a defamation cause of action in this Court. Instead, Plaintiff seeks relief for the substantial commercial injuries caused by Defendants' tortious interference with Plaintiff's prospective business relations, injurious falsehood/trade libel, prima facie tort, as well as equitable relief to the extent permitted by law.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff, a citizen of a State of the United States, and Defendants, citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

12.   Plaintiff Cipriani USA is a corporation organized and existing under the laws the State of New York, with its principal place of business in New York, New York, and is, therefore, a citizen of New York for purposes of 28 U.S.C. § 1332.

13.   Defendant Società Editoriale Il Fatto S.p.A., doing business as *Il Fatto Quotidiano* is, upon information and belief, an Italian corporation with its principal place of business in Italy and is, therefore, a citizen or subject of a foreign state for purposes of 28 U.S.C. § 1332(a)(2).

14.   Defendant Rai – Radiotelevisione Italiana S.p.A. is, upon information and belief, an Italian corporation or state-controlled broadcasting entity with its principal place of business in Italy, and is, therefore, a citizen or subject of a foreign state for purposes of 28 U.S.C. § 1332(a)(2).

15.   Defendant Rai 3 is, upon information and belief, a division, channel, brand, and/or operating unit of RAI and is sued herein as part of and through RAI.

16.   Defendant Report is, upon information and belief, a program, editorial unit, and/or operating division broadcast on Rai 3 and produced, distributed, and controlled by RAI, and is sued herein as part of and through RAI.

17.   This Court has personal jurisdiction over Defendants because Defendants purposefully directed their tortious conduct toward New York and the United States, knew and intended that their conduct would cause injury in New York, transacted business and/or supplied services in interstate and international commerce affecting New York, and committed tortious acts outside New York causing injury to persons and property within New York within the meaning of New York's long-arm statute.

18.   Defendants' publications and broadcasts were accessible in New York, were in fact disseminated into New York, concerned a New York-centered hospitality and business enterprise, and were calculated to affect commercial relationships connected to New York.

19.   Defendant RAI maintains a place of business in New York.

20. Upon information and belief, Defendants intentionally disseminated the challenged content to audiences located within the United States and New York through English-language publications, internet distribution, social-media platforms, search-engine indexing, and television broadcasts available to viewers in the United States.

21. Defendants actively promoted and amplified the challenged content through channels designed to maximize audience reach, engagement, subscriptions, advertising revenue, and commercial benefit, including from audiences located in New York.

22. Defendants knew that the Cipriani enterprise maintained substantial business operations in New York and that allegations concerning business financing, business partners, source of funds, corruption, trafficking, and criminal conduct would foreseeably impact New York-based lenders, investors, counterparties, regulators, patrons, and commercial relationships. Defendants nevertheless continued to disseminate the challenged content after receiving notice that the allegations were false and that commercial harm in New York was occurring.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, a substantial part of the property and business interests injured by Defendants' conduct are situated in this District, and Plaintiff suffered injury here.

### THE PARTIES

24. Plaintiff Cipriani USA, Inc. is a business enterprise associated with the Cipriani hospitality group and conducts substantial business in New York.

25. Giuseppe Cipriani is the controlling shareholder of Plaintiff Cipriani USA.

26. Plaintiff's reputation, lender relationships, financing activities, and commercial opportunities are New York-centered and are materially dependent upon market confidence in the integrity and lawfulness of the Cipriani business enterprise and its controlling principals.

27. Defendant Il Fatto is an Italian newspaper and media outlet that published and republished the false accusations and innuendos described herein.

28. Defendant RAI is an Italian broadcaster that, through Rai 3 and Report, produced, aired, streamed, posted, and republished the false accusations and innuendos described herein.

29. Defendant Rai 3 is the channel on which Report was broadcast.

30. Defendant Report is a current affairs television program that aired and further amplified the false accusations described herein.

31. At all relevant times, each Defendant acted by and through its officers, employees, agents, editors, producers, reporters, contributors, and persons acting in concert with it.

32. At all relevant times, the acts of Defendant Il Fatto's officers, employees, agents, editors, producers, reporters, contributors were authorized, ratified, adopted, approved, condoned, or carried out by Defendant Il Fatto and/or its respective agents acting within the scope of their agency, employment, editorial authority, or apparent authority.

33. At all relevant times, the acts of Defendant Report's officers, employees, agents, editors, producers, reporters, contributors were authorized, ratified, adopted, approved, condoned, or carried out by Defendants Rai, Rai 3, Report and/or its respective agents acting within the scope of their agency, employment, editorial authority, or apparent authority.

## FACTUAL ALLEGATIONS

*The Smear Campaign*

34. Beginning no later than April and May 2026, Defendants engaged in a sustained publication and broadcast smear campaign concerning Giuseppe Cipriani and the Cipriani business enterprise.

35. The campaign centered around four principal themes and false allegations: (i) that Giuseppe Cipriani, in his capacity as principal of Cipriani and Jeffrey Epstein were business

partners and that Epstein had loaned £800,000 to Cipriani; (ii) that Italy's Minister of Justice, Carlo Nordio, met with Giuseppe Cipriani and his partner Nicole Minetti at Cipriani's residence in Punta del Este, Uruguay, to discuss or facilitate Nicole Minetti's presidential pardon application in connection with proceedings pending in Italy (see Exhibit A); (iii) that Giuseppe Cipriani and Nicole Minetti hosted sex- and drug-fueled parties at Cipriani's residence in Uruguay, with insinuations analogizing them to Jeffrey Epstein and Ghislaine Maxwell, respectively; and (iv) that Giuseppe Cipriani and Nicole Minetti corrupted public officials in Uruguay in connection with the adoption and allegedly unnecessary medical treatment of their adopted child and were involved in the alleged assassination of opposing counsel, a totally fabricated and false story including a case of mistaken identity.

36. These accusations were blatantly false.

37. They were also crafted in a manner intended to maximize scandal, outrage, virality, and reputational destruction.

38. Defendants used innuendo, imagery, insinuation, selective quotation, omission of exculpatory facts, and false framing to portray Giuseppe Cipriani as an "Italian Epstein," to portray Nicole Minetti as an "Italian Ghislaine Maxwell," and to suggest criminal, immoral, corrupt, exploitative, and sexually predatory conduct.

39. Defendants knew, or were reckless in not knowing, that such accusations would not remain confined to personal reputation but would directly and immediately infect the business reputation, financing relationships, and commercial prospects of Plaintiff and affiliated Cipriani businesses.

*The False Epstein/£800,000/"Hidden Partner" Narrative*

40. Defendants asserted, expressly or by implication, that Giuseppe Cipriani and/or the Cipriani business enterprise received a loan of £800,000 from Jeffrey Epstein in or about 2010 in

connection with Refifi Ltd. (a UK entity controlled by Cipriani) and a proposed Mayfair project in London by Cipriani.

41.  Defendants' reporting also selectively twisted, mischaracterized, and omitted portions of email exchanges and other communications, thereby attributing false meaning to routine preliminary business correspondence and manufacturing implications that the underlying materials did not support.

42.  Defendants further characterized Epstein as a "hidden partner" (in Italian, "*socio*") or equivalent concealed business associate of Giuseppe Cipriani and Cipriani.

43.  Defendants also sought to create the impression that Giuseppe Cipriani and the Cipriani staff had a lengthy, socially close, and morally suspect relationship with Epstein, including references to an alleged "inner circle," "hundreds of emails," and a relationship supposedly extending over more than a decade.

44.  Those assertions were false and materially misleading.

45.  Preliminary discussions and draft documents concerning a possible financing transaction did occur in 2010. However, no agreement was ever finalized, no financing transaction was consummated, no £800,000.00 was ever wired by Epstein to Giuseppe Cipriani, Cipriani or Refifi Ltd., and Epstein was never a partner—hidden, silent, or otherwise—in Giuseppe Cipriani's or Cipriani's business.

46.  The very materials Defendants purported to rely upon did not support their accusations.

47.  The relevant file materials reflect draft unsigned transaction documents, preliminary legal communications, and discussions of a potential transaction that never closed.

48.  More specifically: (a) email exchanges from August 19–20, 2010 among Cipriani's general counsel, Farrer & Co. LLP (London counsel for Refifi Ltd.), and Jeffrey Epstein's attorney,

in which Cipriani's general counsel sought to set up an escrow account through which proof-of-funds could be transmitted to the seller of the leasehold (see Exhibit B); (c) a draft letter dated August 30, 2010 providing that upon receipt of any Epstein funds, they would be immediately transferred to Farrer & Co.'s escrow account and would not be released without Epstein's consent (see Exhibit C); and (d) draft transaction documents—including a shareholders' agreement, promissory note, loan and option agreement, management agreement, pledge and security agreement, and memorandum of understanding—prepared on or about October 5–6, 2010, all demonstrate that no document in these files reflects execution of any agreement or receipt of any funds.

49.    The formation documents for Refifi Ltd., a company incorporated under the laws of England and Wales, reflect that Giuseppe Cipriani was the company's sole director and shareholder (see Exhibit D). The publicly available Companies House records for Refifi Ltd. (https://find-and-update.company-information.service.gov.uk/company/07310768)—which subsequently changed its name to Rififi Club Limited and then to 15A Hay Hill Limited—confirm that Jeffrey Epstein was never a director, shareholder, or lender of Refifi Ltd. or any other Cipriani entity (see Exhibits E). Mr. Cipriani himself resigned as director of Refifi Ltd. on September 16, 2011 and subsequently assigned Cipriani's interest in the company to a third party investor.

50.    A review of the so-called Epstein Files available in the Epstein Library maintained by the U.S Department of Justice (including searching both account number(s) and sort code/routing number) does not return any responsive document matching the account details of the bank account to which the £800,000.00 wire was allegedly sent.

51. A simple review of publicly available records, including records maintained by Companies House, would have confirmed that Jeffrey Epstein was never a shareholder of, director of, or partner in Refifi Ltd., underscoring the ease with which Defendants could have disproved

their own narrative before publication.

52. Defendants nevertheless presented the matter as if a criminally tainted and concealed partnership had existed.

53. Defendant Il Fatto also grossly distorted the scale and nature of the communications at issue by claiming to have reviewed "140 documents" concerning Giuseppe Cipriani spanning over 10 years in the Epstein files, thereby insinuating an extensive and longstanding relationship.

54. In truth, upon review, the so-called "140 documents" consisted of only 184 pages, including duplicate and overlapping productions of the same email chains, separately Bates-stamped and counted as different documents—a presentation that creates the false impression of far more extensive communications than actually existed. Upon arrangement in chronological order, the 140 documents contain only approximately 25 distinct email threads, all confined to the brief period from June 29, 2010 through October 21, 2010 and all relating solely to a single contemplated and unconsummated business transaction (see Exhibit F).

55. Defendant Il Fatto's contrary portrayal, also widely repeated by Defendant Report, was false, sensationalized, and calculated to create maximum reputational and commercial harm.

56. In addition to the 140 documents, the Epstein Files contain a total of 530 documents referencing the word "Cipriani". Of the approximately 390 documents not already included among the 140, the contexts can be categorized as follows: restaurant reservations (118 documents); conversations between third parties regarding Cipriani restaurant locations (157 documents); requests to call or make an appointment (35 documents); advertisements (17 documents); address book entries (13 documents); conversations about Giuseppe Cipriani among third parties (10 documents); and miscellaneous (36 documents) (see Exhibit G). None of these 390 documents contain any indication that Epstein transferred £800,000.00 to Refifi Ltd., or that Jeffrey Epstein was ever a partner, let alone a friend, of Mr. Cipriani, Plaintiff Cipriani or any affiliate(s) thereof.

57. For context, the names of other well-known hospitality venues appear in the Epstein Files far more frequently than "Cipriani"—among them, Ritz (2,984 documents), Mandarin (1,091 documents), Starbucks (817 documents), Hilton (725 documents), Per Se (677 documents), and STK (610 documents). Defendants did not report any such comparisons, which would have confirmed that the volume of references to "Cipriani" reflected ordinary hospitality patronage, not any exceptional or improper relationship.

58. With respect to Defendant Il Fatto's allegations that Cipriani's locations (including Cipriani's famed West Broadway "Upstairs") were regularly frequented by Epstein, those allegations are false. Threads 15 and 16 of Exhibit F reflect a conversation of 14 messages—many consisting of a single word—exchanged between September 10 and September 13, 2010, in which Epstein requested a reservation at the "Upstairs" lounge that Epstein wanted to tour to understand the Cipriani lounge concept he was contemplating investing in London; on September 13, 2010, Epstein thanked Mr. Cipriani for his hospitality, to which Mr. Cipriani replied that he was sorry he had not been there.

59. As for the remaining 390 documents in Exhibit G, only four emails reference the Cipriani "Upstairs," none of which involve Mr. Cipriani as a party, and which consist of Epstein suggesting to a third party that he visit Upstairs, two emails organizing a dinner there among third parties, and one email from a third party to Epstein reporting that he had visited "Upstairs".

60. There is no basis in these materials for the allegation that Epstein was an habitué at Cipriani "Upstairs," nor any support for any suggestion that Epstein was involved in any misconduct there, or that he was a "partner", let alone a friend, of Cipriani and/or Giuseppe Cipriani.

*The False Nordio Narrative*

61.  Defendants also reported, repeatedly, that Italy's Minister of Justice, Carlo Nordio, visited Giuseppe Cipriani's residence in Punta del Este, Uruguay, to discuss or arrange a corrupt political favor in connection with Nicole Minetti's purported presidential pardon application.

62.  That accusation was false.

63.  Mr. Nordio never met Giuseppe Cipriani and never set foot in Giuseppe Cipriani's residence in Punta del Este, Uruguay.

64.  The allegation originated with Defendant Report's host, Sigfrido Ranucci, who first made the claim while appearing on the program "E' Sempre Cartabianca" ("It's Always Carte Blanche"), broadcast on April 28, 2026, on the Italian Rete4 TV channel. Minister Nordio called directly into the program to deny the allegation in real time, informing Mr. Ranucci that he had never met Mr. Cipriani and had never visited his home in Punta del Este, adding that his official movements to Argentina and Uruguay had been on a documented official government mission occurring one to two years prior and had nothing to do with Mr. Cipriani. Mr. Nordio stated publicly that he was considering legal action in light of what he described as the moral and media degradation to which he had been subjected (see Exhibit A). Mr. Nordio subsequently commenced a defamation action against R.T.I. S.p.A., "E' Sempre Cartabianca," Ms. Berlinguer, and Mr. Ranucci personally, in connection with this false allegation (see Exhibit H). Upon information and belief, Mr. Nordio's action is proceeding.

65.  Defendants were informed that this allegation was false before broadcast and publication.

66.  Nonetheless, Defendants aired and repeated the accusation.

67.  Mr. Ranucci subsequently repeated this allegation on TV during Report's episode "La Zia d'America" ("The American Aunt"), broadcast on RAI 3 on May 3, 2026, despite having

already received a written cease and desist notice that the allegation was false. In the same broadcast, Mr. Ranucci further stated: "*Cipriani, che potere ha di far passare questa istanza di grazia? Sicuramente Cipriani ha degli ottimi rapporti, diciamo, con la politica.*" (meaning, in substance: "Cipriani, what power does he have to push through this pardon application? Cipriani certainly has very good connections, let's say, with politics."). Mr. Thomas Mackinson, reporter for Il Fatto also appeared on the same episode of Report and stated in an interview "*Sicuramente Cipriani ha degli ottimi rapporti con la politica. Il padre era notoriamente amico del ministro Nordio, ma al momento non abbiamo elementi per dire se è stata quella, diciamo, il percorso facilitante che si può anche supporre*" (meaning, in substance "Cipriani certainly has excellent ties to the political establishment. His father was a well-known friend of Minister Nordio, but at the moment we have no evidence to say whether that was—shall we say—the facilitating factor that one might assume").

68.    These statements falsely portrayed Mr. Cipriani as a person who uses corrupt political connections to obtain official favors, compounding the Nordio allegation with an independent false implication of political corruption. Mr. Ranucci thereafter admitted, publicly, that the allegation of a meeting between Mr. Cipriani and Minister Nordio had not been verified prior to broadcast. Defendant RAI itself sent its employee Mr. Ranucci a formal letter of reprimand, accusing him of disseminating unverified information and informing him that Defendant RAI would not provide a legal defense in the event of litigation arising from the false allegation (see Exhibit I). Simply put, Defendants broadcast false and unverified accusations.  Defendant Report's journalist was confronted with a contemporaneous denial, on live national TV, by the alleged victim (i.e., Italy's attorney general), Defendant Report's journalist subsequently admitted non-verification, and was reprimanded by his own employer—yet Defendant Report and Defendant Il Fatto continued to allow the accusations to circulate virally and uncontrollably without any meaningful correction or

retraction.

69.  Defendants thereby sought to portray Giuseppe Cipriani, the Cipriani venues, and those associated with them (patrons, etc.), as politically connected corrupters of public officials or otherwise involved in allegedly shady deals.

70.  That false narrative foreseeably and directly threatened Plaintiff's relationship with its lenders, investors, counterparties, and business relationships, particularly in regulated and reputation-sensitive financial contexts.

*The False "Italian Epstein" / Sex-and-Drugs Parties Narrative*

71.  Defendants further published and broadcast false statements and implications that Giuseppe Cipriani and Nicole Minetti hosted illicit, sex- and drug-fueled parties at Giuseppe Cipriani's residence in Uruguay (a residence, not a "ranch", known as "Gin Tonic") where girls from all over the world, including minors, were allegedly being "trafficked".  Defendant Il Fatto published that such parties were illicit sex and drug fueled parties.

72.  Il Fatto's use of terms such as "noose," together with their repeated invocation of "hunting ground" and "ranch" (a word repeatedly used by both Il Fatto and Report) was calculated to suggest that Giuseppe Cipriani was compromised, controlled, or otherwise morally equivalent to Jeffrey Epstein, notwithstanding the absence of any factual basis for such a comparison. Il Fatto's use of the word "noose" in connection with the unconsummated financing discussions was specifically designed to convey the implication that Mr. Cipriani and Cipriani were compromised, controlled, or "held by the balls" by Epstein—an implication that is false, malicious, and wholly unsupported by the underlying materials. Defendants also cynically juxtaposed Ghislaine Maxwell's reported application for a presidential pardon with an application for a pardon that Ms. Minetti made to President Mattarella of Italy (who granted same in February, and re-confirmed same on June 4, 2026, after a lengthy and unnecessary review by Italian authorities and Interpol

as a result of Defendants' reckless reporting) thereby deliberately importing the criminal infamy of Maxwell's association with Epstein's sex trafficking enterprise onto Ms. Minetti and, by association, onto Mr. Cipriani and Plaintiff Cipriani's business (suggesting, *inter alia*, that Cipriani's venues (including Cipriani's New York venues) are places frequented by the likes of Jeffrey Epstein).

73. Defendants used language and imagery such as "hunting ground," repeated references to a supposed "ranch" (although Cipriani's property in Punta del Este is not a "ranch") and analogies to Epstein's properties and operations (e.g., Epstein's notorious "ranch" in New Mexico), all designed to suggest sexual exploitation, trafficking, predation, and organized misconduct.

74. Defendant Il Fatto also advanced insinuations that Uruguay was somehow a renowned trafficking hotspot because Epstein had sent a wire to someone there approximately four (4) years before the 2010 Refifi Ltd. discussions with Mr. Cipriani occurred.

75. These insinuations were false, reckless, and unsupported and made with the intent to harm Cipriani's reputation.

76. Evidence gathered by Italian law enforcement authorities contradicted the allegations, including sworn statements from current and former personnel of Gin Tonic and information indicating that at least one source had been misquoted or materially mischaracterized.

77. The parties/sex/drugs allegations were sourced, in material part, to one Graciela Torres, whom Il Fatto described as a masseuse who had worked for Mr. Cipriani for over twenty years and who allegedly resigned in March 2025 after witnessing allegedly questionable activity.

78. That characterization was false in material respects. Employment records reflect that Ms. Torres was employed at Mr. Cipriani's Punta del Este residence (Gin Tonic) only during the following limited periods: July 27–August 1, 2024; August 22–August 27, 2024; and October 8,

2024 through February 3, 2025—a total of approximately four (4) months, not twenty (20) years. Upon termination of her employment on February 2, 2025, Ms. Torres filed employment claims against her employer for non-payment of wages and related benefits; those claims made no mention whatsoever of any of the misconduct subsequently attributed to her in Il Fatto's reporting. Ms. Torres claimed approximately $60,000.00 in damages and settled for $6,000.00.

79. Eight sworn affidavits from current and former employees of Mr. Cipriani's Punta del Este residence were obtained and submitted to the Italian Attorney General's Office in Milan, specifically denying and contradicting Ms. Torres' allegations. On May 13, 2026, Ms. Torres was interviewed on the Uruguayan television program "Sin Piedad" and appeared to cast doubt on the accuracy of the statements Il Fatto had attributed to her. Ms. Torres has subsequently confirmed the facts set forth in paragraph 78, and confirmed that Il Fatto misrepresented her words.

80. Upon information and belief, Ms. Torres is considering commencing legal proceedings against Il Fatto for misquoting her and/or taking her statements out of context.

81. The Italian Attorney General's Office in Milan subsequently issued a press release confirming that "it wasn't necessary" to investigate Ms. Torres' allegations, as an Interpol inquiry had not corroborated any of Ms. Torres' accounts (see Exhibits J). Defendant Il Fatto's allegations were a classic red herring. Nevertheless, Plaintiff, was forced to spend exorbitant costs to prove a negative and explain unverified and false information which both Defendants recklessly reported and divulged virally through media platforms.

82. Defendants' publications and broadcasts were transmitted through high circulation newspapers, global social media, global internet platforms, national television in Italy and international television in the U.S. Plaintiff had no access to such channels to defend itself, essentially setting up a showdown between David and Goliath.

83. On May 29, 2026, Torres signed a notarized sworn affidavit in which she confirmed, *inter alia*, that: (i) Ms. Nicole Minetti never solicited girls or otherwise favored prostitution at Mr. Cipriani's residence in Punta del Este, (ii) the ($6,000.00) dispute with Mr. Cipriani was a purely labor dispute, and (iii) she was inexperienced dealing with the media and, as a result, her previous statements were materially distorted or otherwise twisted by Il Fatto.

84. There was and there continues to be no evidence to support the allegations of any illegal or otherwise improper conduct at the residence of Mr. Cipriani in Punta del Este, Uruguay.

85. Defendants nevertheless continued to disseminate and amplify the accusations.

*The Fabricated Adoption and Medical Treatment Narrative*

86. Defendants also disseminated accusations and innuendo that Giuseppe Cipriani and his partner Nicole Minetti improperly procured the adoption of their child in Uruguay, that they corrupted public officials in connection with that process, that the child was brought to the United States unlawfully, and that the child underwent an unnecessary surgical procedure in Boston for the fabricated purpose of manufacturing a medical basis to support a pardon application by Nicole Minetti.

87. In truth, the child suffers from a rare neurological disease, the surgery was medically recommended, and travel to the United States for treatment was expressly authorized in advance by the Instituto del Niño y Adolescente del Uruguay ("INAU"), the competent Uruguayan governmental authority.

88. More specifically, the Child, AFCG (the "Child"), was born with birth defects. The Maldonado Hospital notified social services of concerns about the Child's welfare on December 19, 2017. By February 14, 2018, INAU (Instituto del Niño y Adolescente del Uruguay) had prepared a report documenting that the Child had been taken into care on January 18, 2018 following his biological mother's neglect, drug use while he was hospitalized, and lack of a support

network. The Child's biological mother had a documented history including drug use during pregnancy (which affected the Child), imprisonment for attempted murder, and work as a prostitute; she was given visitation rights but barely attended. The biological father questioned paternity and was himself imprisoned; neither biological parent was deemed a suitable caregiver.

89.   Mr. Cipriani first encountered the Child in late 2019 through charitable work with the orphanage where the Child was then housed. He submitted a formal request to adopt the Child in March 2020. On December 28, 2020, INAU confirmed Mr. Cipriani and Ms. Minetti as temporary joint foster parents responsible for the Child's care and medical needs, under INAU supervision, and the Court of Maldonado confirmed this fostering arrangement on April 28, 2021. On June 17, 2021, the Chairman of INAU granted express written permission for Mr. Cipriani to apply for a Uruguayan passport for the Child so that he could travel overseas for medical treatment in Boston. The Child also obtained a U.S. visa from the U.S. Consulate.

90.   The medical necessity of the Child's surgery was evaluated and confirmed by multiple independent institutions. The Child was evaluated at the Cleveland Clinic in the United States on July 22, 2021, where surgery was recommended. The Child underwent further detailed evaluation at Boston Children's Hospital over several weeks and underwent surgery there in October 2021. The Child's case was also evaluated by physicians from Northwell Health in New York. Uruguayan physicians had previously recommended the same surgery.

91.   The adoption of the Child was finalized by the Court of Maldonado, Uruguay on February 15, 2023. The court's ruling sets forth the complete procedural history from the Child being entrusted to social services through the termination of the biological parents' rights, the fostering period, and the final adoption. As reflected in the ruling, independent attorney Mercedes _Nieto_ was appointed as the Child's guardian ad litem and approved the adoption as being in the Child's best interests. The court appointed attorney Mercedes _Gutiérrez_ (same first name, different

last name) to represent the biological parents' interests; the biological parents were duly notified of the proceedings but did not appear. Attorney Gutiérrez is, upon information and belief, alive and well. Attorney Mercedes Nieto, the guardian ad litem, perished in a house fire on June 15, 2024—over a year after the adoption was finalized—and there has never been any suggestion by Uruguayan authorities that Mr. Cipriani was in any way involved in her death, nor has he ever been contacted in that connection.

92.   The Italian Attorney General's Office in Milan reviewed the allegations relating to the adoption and medical treatment and issued a statement that it was satisfied that there was nothing untoward in connection with these matters (see Exhibit J).

93.   Defendant Il Fatto further falsely reported that Giuseppe Cipriani and Nicole Minetti themselves sued the child's biological mother or initiated proceedings to terminate her parental rights. This was false. In fact, any such proceeding was commenced *sua sponte* by the court of competent jurisdiction in the best interests of the child, not at the request of Giuseppe Cipriani or Nicole Minetti.

94.   Yet, Defendants had the audacity to insinuate that Giuseppe Cipriani was somehow involved in the gruesome deaths (which were described, through innuendos, to be murders with "charred bodies") of Uruguayan attorney Mercedes *Nieto* (and her husband), who  - Defendants falsely stated - represented the Child's mother.

95.   Defendants falsely stated or implied that the child's biological mother disappeared under mysterious circumstances and that counsel for the biological mother could no longer respond. Upon information and belief, the biological mother's counsel was attorney Gutiérrez, not attorney Mercedes Nieto, and attorney Gutiérrez is alive and available.

96.   In a nutshell, Defendants insinuated that Giuseppe Cipriani is a murderer and burned opposing counsel to death.

97. These accusations and implications were false and Defendants went too far, even by the lowest form of tabloid "journalism."

98. The underlying records reflected a supervised, court-governed process involving Uruguayan authorities, including INAU and the Court of Maldonado.

99. The records further reflected that travel for medical treatment was authorized by the competent Uruguayan authority and that the child's surgery was medically recommended following evaluations by qualified providers, including in the United States.

100. The records also reflected that attorney Mercedes Nieto (who was found dead with her husband) acted as guardian ad litem for the child, not as counsel for the biological mother, that she approved the adoption and that there was never a "legal battle" regarding the adoption.

101. Defendants either did not review these materials before publishing or chose to ignore them to again create scandal involving a New York headquartered and internationally recognized super-luxury brand (Cipriani) and, consequently, improve their audience metrics by feeding Cipriani to their scandal-hungry audience.

102. Report even bragged about the fact that Report's website and the program's social media accounts, together, "*are followed by more than three million users*".

103. In either case, Defendants acted intentionally, recklessly, and/or with gross disregard for the truth and for the foreseeable commercial consequences of their accusations.

### *The End of Defendants' Charade*

104. Between June 3, 2026 and June 4, 2026, the office of the (Italian) Attorney General and the Office of the President of Italy finally put an end to Defendants' reprehensible and reckless charade.

105. On June 3, 2026, the office of the (Italian) Attorney General (U.S. Department of Justice equivalent) issued a press release upon completion of its independent investigation into the

many allegations more specifically described above. In its press release, the office of the (Italian) Attorney General unequivocally stated that the investigation conducted by their office in conjunction with Interpol revealed that the facts reported in the press, as more specifically described in this complaint, *are untrue* (See Exhibit K).

106. On June 4, 2026, the Office of the President of Italy (The Office of the U.S. President equivalent) re-confirmed Ms. Minetti's pardon and also unequivocally stated that, following a thorough investigation through law enforcement and Interpol, the allegations appeared in the press *are untrue* (See Exhibit L).

*Defendants Were Given Notice and Continued Anyway*

107. On May 2, 2026, counsel for Cipriani sent a detailed cease-and-desist notice to both Il Fatto and Report (see Exhibit O).

108. The notice set forth, among other things, that Defendants' reporting concerning Epstein, the alleged £800,000.00 loan, the supposed "hidden partner" theory, alleged personal closeness to Epstein, the Nordio allegation, the adoption allegations, and related insinuations were false and demanded immediate cessation, retraction, correction, preservation, and removal.

109. The notice further warned Report, before a planned broadcast, not to air false statements concerning Giuseppe Cipriani and the alleged Nordio connection.

110. Despite that notice, Report proceeded to broadcast false statements, including statements to the effect that Cipriani was a partner ("*socio*") of the "pedophile financier Jeffrey Epstein" and that Cipriani's story somehow resembled that of Jeffrey Epstein.

111. Specifically, and notwithstanding the pre-broadcast Cease and Desist Notice, Report, through Mr. Ranucci, stated on air that "*Cipriani era anche socio del finanziere pedofilo Jeffrey Epstein. Addirittura hanno condiviso insieme un finanziamento…*" (meaning, in substance: "Cipriani was also a partner of pedophile financier Jeffrey Epstein. They even shared a financing

together…"). Report further broadcast that "*la storia di Cipriani sembri in qualche modo ispirarsi a quella di Jeffrey Epstein, tant'è che in questo ranch sarebbero state trafficate ragazze da tutto il mondo, a loro volta selezionate dalla sua compagna Nicole Minetti*" (meaning, in substance: "Cipriani's story seems in some way inspired by that of Jeffrey Epstein, so much so that at this *ranch* girls from around the world would have been *trafficked*, in turn *selected* by his partner Nicole Minetti"). Both statements were broadcast on national and international television and subsequently reposted and republished virally internationally, particularly in the U.S. and New York, across social media platforms, and each was false (see Exhibit O).

112. On May 7, 2026, counsel for Cipriani sent a further written response to Report reiterating the falsity of the accusations and objecting to the continued dissemination of the false narrative.

113. On or about May 5, 2026, Report sent a written response to the Cease and Desist Notice. Rather than acknowledging the falsity of its statements or undertaking any meaningful correction, Report defended its conduct and took the position that it had satisfied its obligations by publishing, in an obscure corner of its website, a communication from Mr. Cipriani's Italian counsel. That position was, as counsel advised Report in the May 7, 2026 response, disingenuous and preposterous: access to an obscure webpage does not constitute correction to the same audience as a nationally broadcast television program and extensive social media distribution. Report's response thus confirmed that it had no intention of providing the full and unambiguous on-air retraction and correction to which Cipriani was entitled and demonstrated knowing indifference to the continuing harm its false statements were causing.

114. Defendants did not undertake a prompt, full, and meaningful correction sufficient to stop the commercial harm that they had set in motion.

115. Instead, they allowed the false accusations to continue circulating virally and uncontrollably across broadcast, print, online, and social media channels, basking in the glory of same.

116. On May 7, 2026, Defendant Il Fatto even published a long article mocking Cipriani and its U.S. counsel's Cease and Desist Notice and possible request for damages, in fact showing sheer ignorance of the existence and purpose of punitive damages in our legal system.

*The Commercial Harm to Plaintiff*

117. In a nutshell, Defendants intentionally and relentlessly fabricated a fictionalized narrative over a period of nearly four (4) months of persistent smear campaign.

118. Plaintiff was forced to face exorbitant costs to explain the unverified and false information which both Defendants recklessly reported and divulged virally through media platforms (including high circulation newspapers, social media, internet, national and international TV channels that include New York subscribers (see, inter alia, https://raitalia.us/)).

119. In a proverbial David versus Goliath battle, Plaintiff had no access to comparable means of communication to contain the hemorrhage of false information being broadcast virally. All Plaintiff could do was retain counsel, send cease-and-desist letters that were essentially ignored (or mocked), and endure the infamy and business fallout with no end in sight.

120. As of writing, Plaintiff's cost associated with "defending itself" is already staggering.

121. Defendants' campaign was aimed not merely at personal embarrassment, but at reputational and commercial destruction.

122. Defendants knew that the Cipriani name is inseparable from Plaintiff's hospitality and business operations, which employs thousands of workers, and that allegations of corruption, trafficking, sexual misconduct, child-related abuse, and ties to Jeffrey Epstein would alarm lenders, investors, counterparties, regulators, patrons and commercial partners.

123. As Defendants intended, or at minimum as was plainly foreseeable, Plaintiff suffered immediate business harm and exorbitant costs.

124. One of Plaintiff's lenders paused the closing of a substantial loan transaction because of the accusations disseminated by Defendants.

125. More specifically, on or about May 14, 2026, one of Plaintiff's lenders (hereinafter "Lender A") notified Plaintiff that it would not proceed with the scheduled closing of a $50,000,000.00 financing transaction until Plaintiff addressed the accusations disseminated by Defendants concerning alleged Epstein relationship, alleged corruption, moral turpitude and alleged criminal misconduct in Uruguay. But for Defendants' false publications, Lender A would not have imposed the requirements described herein.

126. Lender A further required Plaintiff to retain an independent outside investigative firm, at extraordinary hourly rates and substantial total cost, to investigate and establish that Giuseppe Cipriani and/or Cipriani had not committed the acts Defendants had falsely claimed they committed. Plaintiff incurred in excess of $1,000,000.00 in investigative, legal and professional fees, and $50,000,000.00 in delay-related financing costs and other consequential losses, all as a direct and proximate result of Defendants' false publications. Plaintiff would not have incurred any of these costs but for Defendants' intentionally reckless conduct.

127. Lender A has further imposed new more restrictive terms and conditions in the loan documents as a result of Defendants' conduct, which have a material impact on Plaintiff's business.

128. Given the highly regulated world in which Plaintiff and its affiliates operate, Defendants' false publications will inevitably cast Plaintiff in a negative light, for years to come, every time Plaintiff tries to open a new bank account, apply for a license, engage professionals, approach lenders, approach investors and/or strategic partners, causing third parties to decline

dealing with Plaintiff, deny applications and/or at a minimum require costly explanations prior to proceeding. The cost associated with the foregoing, over a period of several years, is unimaginable.

129. Plaintiff has therefore sustained, and continues to sustain, millions of dollars in damages, including delay damages, increased transaction costs, investigative expenses, professional fees, lost business opportunities, impairment of business relationships, and other consequential and special damages in amounts to be determined at trial.

130. Defendants' conduct was intentional, malicious, reckless, wanton, and in conscious disregard of Plaintiff's rights and of the known and foreseeable consequences to Plaintiff's business.

## PUNITIVE DAMAGES ALLEGATIONS

131. Defendants' conduct was, and continues to be, willful, wanton, malicious, reckless, and undertaken with conscious disregard of Plaintiff's rights.

132. Defendants did not merely publish inaccurate information. Defendants were provided with detailed information demonstrating that core aspects of their reporting were false, including evidence disproving the alleged £800,000.00 financing transaction, disproving the alleged meeting between Giuseppe Cipriani and Minister Nordio, disproving allegations concerning the adoption process and medical treatment of the Child, and disproving the alleged factual basis for comparing Giuseppe Cipriani to Jeffrey Epstein.

133. Defendants nevertheless elected to continue publishing, broadcasting, republishing, and amplifying the same accusations. As of writing, the smear campaign continues uncontrolled on various media platforms.

134. Defendants' conduct was particularly egregious because the accusations concerned allegations of criminal conduct, corruption, trafficking, child-related misconduct, and association with Jeffrey Epstein, accusations that Defendants knew carried an extraordinary capacity to inflict

reputational and commercial harm, particularly given the current political climate in the United States.

135. Defendants further acted with conscious disregard of Plaintiff's rights by continuing to disseminate and monetize the challenged content after receiving cease-and-desist notices and after being confronted with documentary evidence establishing the falsity of material aspects of their reporting.

136. Defendants' continued publication and republication of the challenged accusations was motivated, at least in part, by a desire to increase audience engagement, circulation, viewership, website traffic, and corresponding advertising and commercial revenues, notwithstanding the known risk of harm to Plaintiff.

137. Defendants' conduct constituted a willful and wanton disregard of the rights of Plaintiff and was so morally culpable, reckless, and egregious as to warrant an award of punitive damages sufficient to punish Defendants and deter similar conduct by Defendants and others similarly situated.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Tortious Interference with Prospective Business Relations - Against All Defendants)**

138. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

139. Plaintiff had prospective business relationships and economic expectations with lenders, investors, customers, strategic partners, governmental authorities and other counterparties.

140. Defendants knew or should have known of those relationships and expectations, including because Plaintiff and the Cipriani enterprise are prominent international hospitality businesses with substantial interests in New York, the United States, Italy, and Uruguay.

141. Defendants intentionally interfered with those relationships and expectations by publishing and broadcasting false and scandalous accusations calculated to destroy confidence in Plaintiff and its controlling principal.

142. Defendants employed wrongful means, including falsehood, reckless disregard of readily verifiable facts, selective omission, distortion of documentary materials, and the deliberate use of innuendo and implication to impute corrupt, criminal, and sexually predatory conduct.

143. Defendants acted solely out of malice toward Plaintiff and/or used independently wrongful means.

144. Defendants knew or reasonably should have known that Cipriani USA, a prominent New York-centered hospitality business operating under the Cipriani brand name and controlled by Giuseppe Cipriani, depended on lender, investor, landlord, vendor, and counterparty confidence in the integrity and financial legitimacy of the Cipriani enterprise.

145. Defendants' own reporting concerned alleged business financing, alleged hidden partnership in a Cipriani corporate entity, alleged source-of-funds issues, and alleged corruption— topics that are inherently material to commercial lenders, governmental authorities and counterparties. Accordingly, Defendants knew or should have known that publishing false accusations of concealed Epstein financing, criminality, and corruption would foreseeably interfere with Cipriani USA's existing and prospective financing relationships. Defendants were further placed on written notice, before and after broadcast and publication, that the accusations were false and that commercial harm to Plaintiff's financing relationships was a foreseeable and actual consequence.

146. Defendants' conduct was directed at Plaintiff's commercial relationships because the content and context of the publications and broadcasts targeted the precise subjects that lenders and counterparties care about: source of funds, business partner identity, criminal exposure,

regulatory risk, and reputational integrity. While Defendants may contend that their reporting was directed at the public generally rather than at any specific lender, the foreseeability and actual occurrence of interference with Lender A's financing transaction demonstrates that Defendants' conduct was aimed at and did disrupt the exact class of commercial relationships upon which Cipriani USA depends.

147. As a direct and proximate result, Plaintiff lost or suffered delay, impairment, disruption, and/or increased burden in prospective financing and other business opportunities.

148. Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $250,000,000.00.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Injurious Falsehood / Trade Libel - Against All Defendants)

149. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

150. Defendants published false statements and false implications disparaging Plaintiff's business, property, commercial integrity, and business methods.

151. Although some statements expressly named Giuseppe Cipriani, Defendants intended and understood that the accusations would be taken as reflecting upon the legitimacy, lawfulness, and integrity of Plaintiff's business enterprise.

152. The statements and implications were of and concerning Plaintiff's business interests because they accused the controlling principal and the Cipriani enterprise of concealed criminally tainted financing, corrupt political dealings, child-related misconduct, and morally depraved operations at a Cipriani residence.

153. Although Defendants often referred to Giuseppe Cipriani by name, the challenged statements were reasonably understood by audiences to concern the Cipriani enterprise because:

(a) Giuseppe Cipriani is Plaintiff's controlling shareholder and brand ambassador, and the "Cipriani" name is Plaintiff's commercial identity; (b) Defendants' own reporting described alleged business financing arrangements (a purported £800,000.00 loan, alleged hidden partnership in Refifi Ltd., a proposed London project by Cipriani), topics that audiences— including lenders and commercial counterparties—would reasonably understand to concern the Cipriani business enterprise and its flagship U.S. entity; (c) Defendants variously referred to the "Cipriani Group," "Cipriani empire," and Cipriani business operations, not merely to Giuseppe Cipriani as a private individual; and (d) at least one of Plaintiff's lenders in fact treated the accusations as directly relevant to Plaintiff's creditworthiness and commercial standing, pausing a substantial loan closing and requiring an independent investigation before proceeding—concrete proof that the marketplace understood the statements to concern Plaintiff "Cipriani".

154. Plaintiff does not seek recovery merely for reputational offense or personal embarrassment arising from statements about Giuseppe Cipriani. Plaintiff seeks recovery for Defendants' false commercial disparagement of Cipriani USA's business integrity, financing legitimacy, licensability and creditworthiness, which caused identifiable pecuniary losses when Lender A delayed a financing transaction and required an independent investigation. The statements attacked the legitimacy of the Cipriani business enterprise's financing and corporate dealings, not merely Giuseppe Cipriani's personal character: Epstein was alleged to be a business partner in some type of fabricated sordid business environment; the £800,000.00 was alleged to be an unclear "business loan" in connection with a likewise unclear business project; the false allegations of corruption affected lender and compliance risk in commercial transactions. The resulting harm—paused financing, required investigation, specific and quantifiable damages—is commercial in nature, not personal.

Defendants knew the statements were false or acted in reckless disregard of their truth or falsity.

155. Defendants acted maliciously and with the intent to cause pecuniary harm to Plaintiff, or with knowledge that such harm was substantially certain to result.

156. Plaintiff suffered special damages as a direct and proximate result, specifically including: (a) on or about May 14, 2026, Lender A notified Plaintiff that it would not proceed with the scheduled closing of a $50,000,000.00 financing transaction until Plaintiff addressed Defendants' accusations; (b) Lender A required Plaintiff to retain a large law firm to conduct an independent investigation at exorbitant hourly rates; (c) Lender A imposed more restrictive terms and conditions in the financing agreements, (d) Plaintiff incurred and will continue to incur in excess of $1,000,000.00 in legal and professional fees in connection with the foregoing; (e) Plaintiff incurred approximately $50,000,000.00 in delay-related financing costs; and (f) Plaintiff lost or suffered impairment of additional licensing and commercial opportunities in amounts to be determined at trial but in no event less than $250,000,000.00. But for Defendants' false publications, Plaintiff would not have incurred any of these costs or suffered any of these losses.

157. Plaintiff is entitled to recover all such special damages in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Prima Facie Tort - Against All Defendants)**

158. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

159. After being provided with detailed documentary evidence disproving the core allegations concerning Jeffrey Epstein, the alleged £800,000 financing transaction, the alleged meeting with Minister Nordio, the adoption proceedings and alleged murders, the allegedly

unnecessary medical treatment of the Child, and the alleged sex-and-drugs parties, Defendants nevertheless elected to continue publishing, broadcasting, republishing, defending, and amplifying the challenged accusations. Defendants did so despite possessing information demonstrating that material aspects of their reporting were false, misleading, or unsupported.

160. Defendants' conduct went beyond mere reporting. Rather than investigate the evidence provided to them, issue meaningful corrections, or retract demonstrably false accusations, Defendants publicly defended their reporting, mocked Plaintiff's efforts to correct the record, continued to exploit the controversy, and allowed the challenged accusations to circulate virally despite knowing that substantial commercial harm to Plaintiff was occurring and would continue to occur.

161. Upon information and belief, after receiving Plaintiff's cease-and-desist notices and supporting documentation, Defendants did not undertake any meaningful effort to verify the challenged accusations, review the public records identified by Plaintiff, investigate contrary evidence, or determine whether the core allegations remained supportable. Instead, Defendants consciously disregarded information demonstrating the falsity of the accusations and continued to disseminate them.

162. Defendants' sensationalized campaign, including the repeated invocation of Jeffrey Epstein analogies, corruption narratives, trafficking and prostitution, murders innuendo, and accusations concerning a child, was calculated to maximize reputational and commercial injury.

163. Any legitimate journalistic purpose Defendants may have claimed was exhausted once Defendants were presented with documentary evidence disproving the challenged accusations. Thereafter, Defendants continued to publish, defend, and amplify the accusations despite express notice of falsity and despite the known and foreseeable commercial harm being inflicted upon Plaintiff.

164. Plaintiff suffered special damages, including identified and quantifiable economic losses, as a direct and proximate result.

165. Defendants are liable to Plaintiff in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Equitable Relief  - Against All Defendants)

166. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

167. Defendants' conduct has caused and continues to cause irreparable harm to Plaintiff's business reputation, financing relationships, and commercial opportunities.

168. Monetary damages alone are insufficient fully to remedy the continuing harm from the ongoing online availability, rebroadcast, reposting, clipping, excerpting, and algorithmic recirculation of the false accusations.

169. Plaintiff has no adequate remedy at law to prevent continued repetition and amplification of the same false factual assertions and commercially injurious implications.

170. Plaintiff seeks only such narrowly tailored equitable relief as may be constitutionally permissible following adjudication of the falsity of the challenged statements, including removal, de-indexing, correction, and prevention of further republication of statements determined by this Court to be false.

171. Plaintiff does not seek to restrain lawful reporting or protected opinion, but rather seeks relief necessary to prevent the continuing dissemination of adjudicated falsehoods causing ongoing commercial injury.

172. Defendants' publications remain continuously accessible through websites, social media platforms, search-engine indexing, reposting, clipping, and algorithmic amplification, causing renewed injury each time the challenged statements are accessed, shared, or republished.

173. Monetary damages cannot fully remedy the ongoing and repetitive nature of such harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Defendants, jointly and severally, as follows:

A. Awarding compensatory damages in an amount to be determined at trial, but believed to be in the millions of dollars;

B. Awarding special damages, including without limitation delay damages, financing-related losses, increased transaction costs, investigative costs, professional fees, and lost business opportunities;

C. Awarding consequential damages in an amount to be determined at trial but in no event less than $250,000,000.00;

D. Awarding restitution and disgorgement of all revenues, gains, and benefits unjustly obtained by Defendants through the conduct alleged herein;

E. Awarding punitive damages in an amount to be determined at trial;

F. Awarding pre-judgment and post-judgment interest as permitted by law;

G. Awarding Plaintiff its costs and disbursements incurred herein;

H. Awarding such injunctive and declaratory relief as the Court deems just and proper; and

I. Awarding such other and further relief as the Court deems just, proper, and equitable.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, NY
        June 5, 2026

By:   /s/ Andrea Fiocchi
            _____

Stefan Savic, Esq.
Andrea Fiocchi, Esq.
Brian L. Grossman, Esq.
**REINHARDT SAVIC FOLEY LLP**
Wall Street Plaza
88 Pine Street, 5th Floor
New York, New York 10005
Telephone:    (212) 710-0970
Facsimile:    (212) 710-0971
ssavic@rsf-llp.com
afiocchi@rsf-llp.com
bgrossman@rsf-llp.com
*Attorneys for Cipriani USA, Inc.*